THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NOLDON WADLEY, Defendant-Appellant.

First District (2nd Division)  No. 85—1359

Opinion filed May 10, 1988.—Rehearing denied June 6, 1988.

Steven Clark and Thomas Long, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., and Kenneth T. McCurry, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BILANDIC delivered the opinion of the court:

A jury convicted defendant, Noldon Wadley, of murder, and specifically found that the murder was committed with intent to prevent the victim from testifying in another murder trial. Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(2), (b)(8).

The 18-year-old victim, Cynthia Berrian, was murdered on May 16, 1984, at approximately 6:30 p.m., in an alley near 47th and Langley Streets in Chicago, Illinois. Pauline,[1] a 13-year-old witness, lived in an apartment in that area. When the police arrived, she told them that as she was looking out a bedroom window, she saw the victim walking alone down the sidewalk on Langley Street. The victim then turned into a vacant lot and looked over her shoulder. Pauline further stated that she saw defendant, whom she knew as "Nick," with his right hand inside his jacket pocket following the victim into the vacant lot. She then lost sight of the victim and defendant when they approached the alley at the rear of the vacant lot. Immediately thereafter, Pauline heard three gunshots. She ran to get her mother

---

[1]The full names of the minor witnesses are being withheld in this opinion.

and they went to the alley where they saw the victim lying on the ground with blood around her head.

Pauline stated that she saw defendant standing on the corner of 47th and Langley Streets every day. Although she did not know his last name, she remembered that her aunt's sister brought the defendant to a family birthday party in May 1984. A detective then contacted the aunt's sister and learned defendant's last name. Officers could not locate defendant so they canvassed the neighborhood, taking several photographs with them.

Detectives spoke with 10-year-old Clarence and his mother, who lived on Langley Street. Clarence told them that he was playing softball in the area at the time of the murder. As the catcher, he was facing the alley at the end of the vacant lot where he saw the victim walk into the alley followed by a man whom he later identified as defendant from photographs. He stated that as defendant entered the alley behind the victim, he saw defendant pull a small gun from his jacket with his right hand. Defendant held the gun with both hands, shot the victim three times, and then ran through the alley to 47th Street.

After receiving an anonymous tip, the police arrested defendant, along with three other men, at an apartment on June 22, 1984. Defendant told detectives that he was conducting some business in the area at the time of the shooting. He stated that after hearing gunshots, he got nervous and left the area on a bus. He also told the detectives that he "ran" with members of the Black Gangster Disciples and that Larry Crittendon was the leader of that gang.

Witnesses were assembled and a lineup was conducted the day following defendant's arrest. After 10-year-old Clarence identified defendant, officers contacted Assistant State's Attorney Ruber. Defendant repeated his original statement. The following day, June 24, 1984, a second lineup was conducted, at which time 13-year-old Pauline identified defendant. Subsequently, officers contacted Assistant State's Attorney Nelson, who told defendant that he had been identified by witnesses in both lineups. After spending a short time alone, defendant told Assistant State's Attorney Nelson and other officers: "Yes, I shot the girl, but I am scared, I am real scared." Defendant explained that he was afraid of Larry Crittendon, whom he called "Gangster Larry," because Larry was head of the Disciples gang of which defendant was a member.

Defendant told law enforcement officials that he was standing on the corner of 47th and Langley Streets on the day of the murder. He saw Larry Crittendon standing across the street talking to a black

man and the victim. Larry motioned for defendant to come over to him. As defendant approached him, the victim walked away. Larry handed him a gun and told him to shoot the girl. When defendant told him he did not want to shoot her, Larry responded, "[E]ither you shoot her or we shoot you." Defendant further stated that he followed the girl, raised the gun to shoulder level, and fired at her at least three times, hitting her in the head. He then ran through the alley, threw the gun behind some bushes, and jumped on a bus.

Defendant agreed to give a formal court reporter statement. He then reviewed the transcript of his statement and initialed and signed each page. He also told Assistant State's Attorney Nelson that his earlier statements were not true.

Defendant's statement was admitted into evidence and read to the jury. On appeal, he does not question the propriety of the admission of that evidence.

During trial, the first officer to arrive at the scene described the area and the victim. He testified that the victim had two bullet wounds in the head and that there was no evidence of a robbery or rape. The victim was taken to the hospital, where she died. A pathologist confirmed that the victim died of gunshot wounds to her head.

Bruce Brown, a former member of the Cadillacs Gang, was in the apartment at the time of defendant's arrest. He knew defendant to be a member of the gang that "hung out" around 47th Street. Brown testified that on the day of the murder, he was in an apartment with three friends playing cards. Defendant told them, "I am going to kill the motherfucker. I am going to kill me a motherfucker." One of the men in the apartment told defendant to stop talking about it. Defendant left at about 4 or 5 p.m.

Brown saw the defendant at the same apartment a couple of days after the murder. The defendant told him that "[t]he police are on my ass for a murder I did of a bitch who was trying to be a witness."

Derrick Holliday, another gang member who was also in the apartment at the time of defendant's arrest, knew that defendant was a member of the Disciples Gang. The day after the murder, defendant asked Holliday if he had heard about the girl who was killed. The defendant said: "The police are looking for me because I shot her because she was going to testify against one of my folks named 'Chico' who was going to testify soon." Defendant also told Holliday that Larry Crittendon wanted the girl killed.

The State presented the testimony of Assistant State's Attorney Chris Cronson, who was assigned to the gang crimes unit. He prosecuted gang-related cases, taught and attended seminars on gang mat-

ters, and was involved in numerous gang crime investigations and surveillance. His testimony covered the names of major gangs in Chicago, common terms, phrases, symbols, and the various territories claimed by gangs.

Cronson was assigned to an investigation of a double murder which occurred in the area where the Disciples operated. That investigation led to the prosecution of Marshall McNeil, a/k/a "Chico," who also was a member of the Disciples. He became familiar with Larry Crittendon and defendant as a result of that investigation.

The victim in the instant case witnessed the murders for which McNeil was charged. She was scheduled to testify against McNeil at his trial on June 4, 1984, approximately two weeks after she was murdered.

Defendant testified on his own behalf. He stated that at the time of the murder, he had walked about 30 feet into the vacant lot off Langley Street when he heard three shots. Earlier that day, he had seen Larry Crittendon, an unidentified man, and a girl arguing on the corner of 47th and Langley Streets. He saw the girl leave the group followed by one of the men. She walked into the vacant lot just before defendant entered the lot.

Defendant told the jury that he was high on drugs when he gave statements to the police. He maintained that his subsequent confession was false and he was repeatedly beaten by the officers. The officers denied any mistreatment.

The jury convicted defendant of murder but found, at a subsequent hearing, that he should not be given the death penalty. Consequently, the court sentenced defendant to life imprisonment.

Defendant seeks a reversal of the conviction and a new trial on the grounds that: (1) the court erred in denying his motion for substitution of a judge; (2) evidence of gang membership and other crimes was improperly admitted; (3) he was improperly impeached; and (4) the trial court's *sua sponte* "jury instruction" deprived him of a fair trial.

## I

A defendant may move in writing for a substitution of a particular judge on the ground that such judge is so prejudiced against him that he cannot receive a fair trial. The motion must be made within 10 days after the case has been placed on the judge's trial call and before the trial judge has ruled on any substantive issues. (Ill. Rev. Stat. 1983, ch. 38, par. 114—5(a).) If these requirements are met, the defendant has an absolute right to have the case

transferred to another judge. (*People v. Aldridge* (1981), 101 Ill. App. 3d 181, 184, 427 N.E.2d 1001, *appeal denied* (1982), 88 Ill. 2d 552.) The only issue before us is whether the motion was filed on time.

The record shows that defendant was arraigned before Judge Fitzgerald on July 16, 1984. Defendant appeared with counsel, acknowledged receipt of the indictment and waived formal reading. The clerk, rather than the judge, announced that the case was assigned to Judge Maloney. Later that same day, the defendant appeared with counsel before Judge Schreier. The parties agreed to continue the matter until August 10, 1984, for the exchange of discovery information. Judge Schreier was substituting for Judge Maloney in Judge Maloney's courtroom.

On August 10, 1984, the parties appeared before Judge Maloney and, by agreement, the exchange of discovery information was continued to August 30, 1984. Also on August 10, 1984, after the appearance before Judge Maloney, defendant filed his written motion for substitution of judge alleging that Judge Maloney was prejudiced against him. When the motion was presented to the trial court on August 30, 1984, it was denied on the ground that it was not timely filed.

Defendant concedes that his case was "technically" assigned to Judge Maloney on July 16, 1984, but contends that the "manner" in which the assignment was made created confusion. The basis of this argument is that the clerk, and not the chief judge, informed the parties of the assignment. In addition, defendant states that his appearance in Judge Maloney's courtroom, with Judge Schreier substituting for Judge Maloney, added to the confusion. Therefore, he contends that the first time he could be charged with knowledge that the case was assigned to Judge Maloney was on August 10, 1984, when he first appeared before Judge Maloney in his courtroom. Since the motion was filed on August 10, 1984, it was timely. We disagree.

There is no allegation of inadequate representation by counsel. Defendant was represented by able counsel at each step of the proceedings. Counsel knew that the case was assigned to Judge Maloney on July 16, 1984. Counsel and the defendant then went to Judge Maloney's courtroom on the very same day. The fact that another judge was hearing Judge Maloney's call on that day is not an unusual or confusing circumstance. Counsel was obviously aware of the assignment and that knowledge is imputed to the defendant. (*People v. Kostos* (1961), 21 Ill. 2d 451, 454, 173 N.E.2d 469.) Additionally, this court has held that "[i]t is neither unreasonable nor manifestly unfair to charge a defendant with knowledge of local courtroom assignment

procedures when his attorney represented him continuously for this amount of time." (*People v. Aldridge* (1981), 101 Ill. App. 3d 181, 185, 427 N.E.2d 1001, *appeal denied* (1982), 88 Ill. 2d 552.) While the period of time involved here is shorter than six months, and the number of appearances is less than in *Aldridge*, the legal principle is equally applicable to the facts of this case.

Knowledge of the assignment can be imputed to the defendant on July 16, 1984. The motion for substitution of judge must be made within 10 days of July 16, 1984. It was filed on August 10, 1984, 25 days later, and therefore the trial court correctly denied the motion because it was not timely.

## II

Defendant raises several evidentiary errors.

### A

■ First, he claims that the admission of Assistant State's Attorney Cronson's testimony deprived him of a fair trial. Defendant's arguments are based on his theory that Cronson testified as an expert.

We will not prolong this opinion by repeating the substance of Cronson's testimony. A review of the evidence demonstrates that he did not testify as an expert. His testimony was based on his personal knowledge and observation.

Defendant's objection on the grounds of relevancy was overruled and he failed to raise the issue in his post-trial motion. Thus, the issue is waived on appeal. (*People v. Johnson* (1986), 150 Ill. App. 3d 1075, 1081, 502 N.E.2d 304, *appeal denied* (1987), 113 Ill. 2d 580.) However, we will address the issue in light of defendant's argument that the admission of this evidence deprived him of his constitutional rights.

Several witnesses for the prosecution testified that defendant was a member of the Disciples Gang who operated in the area where the murder occurred. Witness Holliday made reference to "Chico," and Holliday and Brown each repeated defendant's inculpatory statements. The evidence also shows that defendant had gang sign tattoos on his chest. The State's theory of the case was that defendant murdered Cynthia Berrian with the intent to prevent her from testifying for the prosecution at the murder trial of a fellow gang member. The victim was murdered shortly before she was scheduled to testify in that murder case.

Proof of gang membership is admissible only if there is sufficient proof to show that such membership is related to the offense charged.

(*People v. Hairston* (1970), 46 Ill. 2d 348, 372, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658.) Gang membership is relevant to show common design or purpose. (46 Ill. 2d at 372.) Proof of motive is always relevant in a criminal prosecution to show that defendant committed the offense with which he is charged. (*People v. Wright* (1986), 140 Ill. App. 3d 576, 579, 488 N.E.2d 1344, *appeal denied* (1986), 112 Ill. 2d 568.) Thus, the evidence was relevant and properly admitted.

Defendant's argument that Cronson's testimony was not based on personal knowledge and its nature did not justify its admission into evidence under the "guise" of expert testimony is unpersuasive. The record clearly shows that Cronson did not testify as an expert. Rather, the background evidence laid the necessary foundation for his testimony.

Cronson was a member of the State's Attorney Gang Crimes Unit which handled the investigation and prosecution of gang related crimes, including the murder case in which the victim in this case was scheduled to testify. His testimony was based on his personal experience. The evidence was rationally based upon his personal knowledge of the defendant's activities prior to the murder in this case and was, therefore, admissible. *People v. Starks* (1983), 119 Ill. App. 3d 21, 26, 456 N.E.2d 262, *cert. denied sub nom. Miller v. Illinois* (1984), 469 U.S. 828, 83 L. Ed. 2d 55, 105 S. Ct. 112.

## B

■ Next, defendant claims the court abused its discretion when it permitted the State to cross-examine him about his drug-related activities. We disagree.

Defendant told officers that he conducted his business of selling drugs on the corner of 47th and Langley Streets. He also claimed to be high on drugs when he made inculpatory statements.

The court granted defendant's motion *in limine* precluding the State from using portions of defendant's statements about his use or sale of drugs. The scope of that ruling was adhered to by the State's witnesses. Cross-examination on the subject was permitted only after the defendant testified on his own behalf.

Defendant now argues that the court abused its discretion when it permitted the cross-examination because the probative value of the evidence did not outweigh its prejudicial value.

The scope of cross-examination is well within the discretion of the trial court. Its decision will not be reversed absent an abuse of direction resulting in prejudice to defendant. *People v. Santiago* (1987),

161 Ill. App. 3d 634, 642, 515 N.E.2d 228, *appeal denied* (1987), 117 Ill. 2d 551.

During direct examination, the defendant told the jury that he knew and recognized "Gangster Larry" Crittendon because he hung out on the corner of 47th and Langley Streets four to five days a week, between 11 a.m. and 10 p.m. On the day of the murder, he was standing on the corner when he saw a woman arguing with Larry Crittendon and another man. He saw the man, whom he did not know, follow the woman into the vacant lot. He heard the gunshots when he approached the lot and left the area on a bus. Clearly, defendant's account of his activities on the day of the murder was inconsistent with his prior statements when he told the police that he bought drugs from Larry Crittendon, was conducting his business of selling drugs on the corner of 47th and Langley Streets, and at the time of the murder, went into the lot to get his drugs.

The court reconsidered its ruling after defendant's direct testimony and found that the facts concerning the defendant's drug activities with Larry Crittendon were "inextricably intertwined" with the events surrounding the shooting and defendant could not, by his own testimony, create a different impression for the trial.

Defendant "opened the door" to this evidence and cannot now claim error. The testimony at issue was invited by the defendant and thus did not deprive him of a fair trial. (*People v. Zuniga* (1973), 53 Ill. 2d 550, 557-58, 293 N.E.2d 595.) The trial court did not abuse its discretion.

Moreover, we note that the cross-examination about the previously omitted portions of defendant's statements was proper since, after defendant's testimony, any further omission would mislead and confuse the trier of fact. *People v. Weaver* (1982), 92 Ill. 2d 545, 558, 442 N.E.2d 255.

■ Defendant's alternative argument that the evidence was inadmissible because it amounted to proof of other crimes must also fail. Evidence of other crimes is admissible where relevant to establish facts material to the prosecution and for any purpose other than to show propensity for crime. (*People v. Wright* (1986), 140 Ill. App. 3d 576, 578, 488 N.E.2d 1344, *appeal denied* (1986), 112 Ill. 2d 569.) Evidence that places a defendant in proximity to the time and place of the crime tends to prove design, motive, knowledge or to disprove an alibi is admissible as long as the court determines that its probative value outweighs any prejudice to the accused. *People v. Wallace* (1983), 114 Ill. App. 3d 242, 249, 448 N.E.2d 910.

The evidence was excluded until defense counsel "opened the

door" by inquiring into defendant's presence in the area and his activities. The court permitted the cross-examination after defendant placed his relationship with Larry Crittendon and his drug-dealing activities at issue by his own testimony. Where the subject matter of the evidence complained of is first entered into by the defense, the State clearly has the right to question a witness on these matters in order to present the full story to the jury. *People v. Nally* (1979), 75 Ill. App. 3d 762, 764, 394 N.E.2d 776.

Relevant admissible evidence need not be excluded simply because it tends to prejudice the accused. (*People v. Hairston* (1970), 46 Ill. 2d 348, 372, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658.) The record reflects that the trial court considered defendant's arguments concerning the relevance and the potentially prejudicial impact of the evidence in its rulings on the motion *in limine* and during trial. Thus, the evidence was relevant and its admission was proper.

## C

██ Next, defendant maintains that he was improperly impeached and the admission of rebuttal testimony concerning his prior convictions was prejudicial and warrants a new trial. His argument is threefold: (1) he alleges that any cross-examination about his relationship with other members of Larry Crittendon's family was improper since these relationships involved matters collateral to the murder of Cynthia Berrian; (2) even if these matters were not collateral in the instant case, the form of cross-examination was improper since it disclosed prior criminal acts; and (3) rebuttal evidence concerning the details of prior offenses was improper and prejudicial.

The latitude allowed on cross-examination and rebuttal is a matter within the sound discretion of the trial court. A reviewing court should not interfere unless there has been a clear abuse of discretion that results in manifest prejudice to the defendant. (*People v. Collins* (1985), 106 Ill. 2d 237, 269, 478 N.E.2d 267, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) Generally, any permissible kind of impeachment material may be developed during cross-examination since one of the obvious purposes of cross-examination is to test the credibility of the witness. (106 Ill. 2d at 269.) However, the State may not impeach a witness on a collateral matter.

The test to determine whether a matter is collateral is whether it could be introduced for any purpose other than to contradict. (106 Ill. 2d at 269.) The trial court is vested with broad discretion when applying this "collateral" test. 106 Ill. 2d at 269-70.

In the instant case, the record demonstrates that the impeachment was proper. Defendant testified that he did not know Larry Crittendon. However, he was able to recognize him. He also denied knowing two members of Larry Crittendon's family. Accordingly, the State inquired about defendant's relationship with Crittendon on cross-examination. The State also confronted him by asking if he remembered being arrested with two members of Crittendon's family on two separate occasions. Defendant then asserted that he recalled them merely being present when he was arrested. Consequently, evidence was admitted to show that defendant was indeed arrested with the two members of Crittendon's family on two separate occasions on unrelated charges. Thus, the evidence was highly probative, relevant to defendant's relationship with Larry Crittendon and members of his family, and admissible to show motive. Defendant's relationship with Larry Crittendon was relevant to both the State's theory of the case, as well as the defense theory. We do not find the trial court's ruling to be an abuse of discretion.

■ We do conclude, however, that the rebuttal evidence exceeded the permissible scope. During rebuttal, the State presented evidence concerning the circumstances and details surrounding defendant's prior arrests. Our review of the record demonstrates that the admission of this evidence, while erroneous, was also harmless. Testimony relating to other offenses does not *per se* constitute grounds for reversal. (*People v. Wallace* (1983), 114 Ill. App. 3d 242, 250, 448 N.E.2d 910.) Where every element of the crime charged has been established by properly admitted evidence and that evidence is so overwhelming that there is no reasonable probability that defendant would have been acquitted if the inadmissible evidence had been excluded, the error is harmless.

In the case at bar, two witnesses observed and identified the defendant as the offender. The defendant admitted the crime to other witnesses and gave a formal written confession to an assistant State's Attorney and the police. Therefore, it is extremely unlikely that the jury would not have convicted defendant. Moreover, the trial court admonished the jury about the limited nature of the evidence complained of. The evidence did not so prejudice defendant as to deny him a fair trial.

### III

■ Finally, defendant argues that he was denied a fair trial because the court's "*sua sponte*" oral jury instruction precluded the jury from considering his theory of the case.

The record reveals that immediately after reading the written instructions, the trial judge orally admonished the jury as follows:

"[T]he names of other people were mentioned during the trial of this case and you may consider them criminally responsible in this case. But you are instructed that no persons other than the defendant are concerned. You are not to expand your deliberations to include any other persons."

Defendant's argument is premised on the requirement that all jury instructions must be in writing. (Ill. Rev. Stat. 1983, ch. 110, par. 2—1107; 107 Ill. 2d R. 451(c).) The function of jury instructions is to convey to the jury the correct principles of law applicable to the evidence submitted, so that the jury may arrive at a correct conclusion according to the law and evidence. *People v. Richards* (1978), 64 Ill. App. 3d 472, 474, 381 N.E.2d 307, *appeal denied* (1978), 71 Ill. 2d 613.

A trial court is obligated to use restraint in issuing instructions *sua sponte* so as not to interfere with or frustrate defense strategy. *People v. Requena* (1982), 105 Ill. App. 3d 831, 837, 435 N.E.2d 125, *cert. denied* (1983), 459 U.S. 1204, 75 L. Ed. 2d 436, 103 S. Ct. 1191.

It is well established not every direction to the jury is to be considered an "instruction" requiring written form. (*People v. Dunigan* (1981), 96 Ill. App. 3d 799, 827, 421 N.E.2d 1319, *appeal denied* (1981), 85 Ill. 2d 569.) In applying this principle, this court in *Dunigan* first noted that the trial judge, just prior to closing arguments, had told the jury that they were to disregard any testimony concerning the defendant's sanity. (96 Ill. App. 3d at 827.) This court then held that the oral "instruction" complained of in *Dunigan* was not an "instruction" within the contemplation of the statute, but was merely an evidentiary ruling in the form of an admonishment. (96 Ill. App. 3d at 827.) This court also found that the defendant suffered no prejudice from the trial judge's oral direction.

As in *Dunigan*, the trial judge's oral direction in the instant case was merely an evidentiary ruling. When examining instructions on appeal, no single instruction is to be judged in artificial isolation. (*People v. Goff* (1985), 137 Ill. App. 3d 108, 115, 484 N.E.2d 414.) The challenged instruction must be viewed in the context of the entire charge. (137 Ill. App. 3d at 115.) The defendant did not suffer any prejudice from the alleged instruction.

Our review of the record and the instructions taken as a whole leads us to the conclusion that the jury was adequately and properly instructed.

## IV

In addition to the briefs filed by counsel, we allowed the defendant leave to file a *pro se* supplemental brief. It is not necessary to unduly prolong the length of this opinion. After a careful review, we conclude that the points raised by the defendant, neither individually nor cumulatively, establish that the defendant was denied a fair trial.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN, P.J., and STAMOS, J.*, concur.

*Justice Stamos participated in the decision of this case prior to taking office as a supreme court judge.